UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
BRENNA KELLY-STARKEBAUM, individually    :
and on behalf of all others similarly    :
situated,                                :    24cv2310 (DLC)
                             Plaintiff,  :
                                         :    OPINION AND
              -v-                        :    ORDER
                                         :
PAPAYA GAMING LTD. and PAPAYA GAMING,     :
INC.,                                    :
                             Defendants.  :
                                         :
---------------------------------------- X

APPEARANCES:

For plaintiff Brenna Kelly-Starkebaum:
Matthew S. Tripolitsiotis
Cristina Rose Delise
Burns Charest LLP
757 Third Avenue, 20th Floor
New York, NY 10017

Amanda Klevorn
Burns Charest LLP
201 St. Charles Avenue, Suite 2900
New Orleans, LA 70170

Spencer Cox
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, TX 75202

For defendants Papaya Gaming, Ltd., and Papaya Gaming, Inc.:
Michael W. McTigue, Jr.
Meredith Slawe
Anthony Joseph Dreyer
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

DENISE COTE, District Judge:

Plaintiff Brenna Kelly-Starkebaum brought this action against Papaya Gaming Ltd. and Papaya Gaming, Inc. (collectively, "Papaya") alleging that they violated New York consumer protection law through their deceptive operation of online games.  Papaya has moved to compel arbitration and stay the case.  For the following reasons, Papaya's motion is granted.

## Background

The following facts are taken from the plaintiff's complaint and the evidence that was submitted in connection with Papaya's motion to compel arbitration.  This Opinion summarizes only those facts relevant to the instant motion.  Any factual disputes are noted.

Papaya operates an online gaming platform that allows users to join in various competitions using their mobile devices. Users can stake real money on the outcomes of those games by first depositing their money into their Papaya account.

The plaintiff is a resident of Minnesota who played two or three different games on Papaya's platform.  She first registered for Solitaire Cash on May 20, 2021, and then for 21 Cash on November 27, 2021.  Over the next two years, the plaintiff accessed her account on at least 417 days and played

2

at least 5,976 sessions of Papaya's games.  She made 314 deposits into her Papaya account and lost thousands of dollars. The plaintiff last made a deposit and played a game on May 2, 2023, and she last accessed Papaya's platform on March 8, 2024.

A.   The Deposit Screen

Each time that the plaintiff deposited funds into her Papaya account either by using a payment method she had not used before, or by using Apple Pay, she encountered a deposit screen that linked to Papaya's Terms of Use ("deposit screen"). According to Papaya's records, the plaintiff encountered and proceeded through this interface 61 times, including in May 2021, December 2021, twice in March 2022, and on 57 more occasions between November 2022 and May 2023.

As of March 2023, below a banner that read "DEPOSIT TO GAME", the deposit screen listed several fields, each with an associated dollar amount, including "Deposit Amount:", "Bonus Cash:", and "New Balance:".  Below those fields, the screen read "Checkout with:", followed by three buttons representing Apple Pay, Credit Card, and PayPal, respectively.  Below those buttons, in small, dark brown font, was the sentence: "By continuing, I state that I am over 18 years old, and agree to the Terms and Conditions."  The phrase "Terms and Conditions", but not the rest of the sentence, was underlined, and it

hyperlinked to Papaya's Terms of Use.  To the sentence's left
was a pre-checked checkbox.  Below the sentence linking to the
Terms were several icons indicating different payment methods,
including Apple Pay, PayPal, Visa, MasterCard, and American
Express.  At the very bottom of the screen was the line "Need
Help? Contact SUPPORT", with the word "SUPPORT" underlined.

Between January 2021 and March 2023, the appearance of the
deposit screen varied slightly, mostly with respect to the
payment methods displayed.  That is, some versions included one
or two buttons below the phrase "Checkout with:", and some
included three.  Also, the number of icons representing
different payment methods changed slightly, as did the wording
of the line at the bottom of the screen beginning with the
phrase "Need help?".  At all times during this period, the line
in small brown font linking to the Terms of Use appeared between
the payment buttons and the payment type icons.

B.   Papaya's Terms of Use

During the two years that the plaintiff used Papaya's
applications and encountered the deposit screen, three versions
of Papaya's Terms of Use were in effect at different times.  One
version took effect on January 20, 2020 ("2020 Terms"), one took
effect on April 28, 2022 ("2022 Terms"), and one took effect on
March 28, 2023 ("2023 Terms").  Each of these versions appeared

on the Papaya website and were hyperlinked on the deposit

screen.  Their substance and organization varied to some extent,

but they all contained an agreement to arbitrate disputes

arising from the use of Papaya's services.

1.    The 2020 Terms

The 2020 Terms were in effect when the plaintiff first

encountered the deposit screen on May 20, 2021, and for

approximately the following year.  In their second paragraph,

the 2020 Terms stated:

> BY REGISTERING AN ACCOUNT AND PARTICIPATING IN ANY
> COMPETITIONS AND TOURNAMENTS HELD AT THE WEBSITE, AND
> AFTER ANY CHANGE OF THIS TERMS BY CONTINUED USE OF THE
> WEBSITE, YOU AFFIRMATIVELY SIGNIFY THAT YOU HAVE READ,
> UNDERSTOOD, AND AGREE TO BE BOUND BY THIS TERMS, OUR
> PRIVACY POLICY AS WELL AS RESPECTIVE RULES OF PLAY
> ("RULES"), EACH INCORPORATED HEREIN BY REFERENCE.[1]

The following paragraph addressed arbitration:

> BY REGISTERING AN ACCOUNT AND/OR OTHERWISE ACCESSING
> THE WEBSITE, TO THE MAXIMUM EXTENT PERMITTED UNDER
> APPLICABLE LAW, YOU AGREE THAT ANY CLAIM, DISPUTE OR
> CONTROVERSY OF WHATEVER NATURE ARISING OUT OF OR
> RELATING TO THESE TERMS AND/OR YOUR USE OF THE WEBSITE
> AND SERVICES SHALL BE RESOLVED BY FINAL AND BINDING
> ARBITRATION IN ACCORDANCE WITH THE PROCESS DESCRIBED
> IN SECTION 20 BELOW.  PLEASE READ SECTION 20
> CAREFULLY.  SECTION 20 OF THESE TERMS CONTAINS A
> WAIVER OF YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS
> AGAINST PAPAYA AND ITS AFFILIATES[.]

---

[1] The first paragraph of the 2020 Terms defined "website" as
http://www.papayagaming.com.

Section 20, which appeared near the end of the document, was titled "AGREEMENT TO ARBITRATE/CLASS ACTION WAIVER".  It stated that the "laws of the State of Missouri" would apply to any dispute arising between the user and Papaya.  It then described a process for informally resolving disputes with the company via mail.  Next, the section read, "You agree that any and all disputes or claims that have arisen or may arise between you and [P]apaya relating in any way to or arising out of these Terms or your use of or access to the Services shall be resolved exclusively through final and binding arbitration."[2]

Following a waiver of the rights to have a trial by jury and to consolidate multiple users' claims against Papaya, the agreement delegated to the arbitrator the authority to resolve disputes.  It stated:

> The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of the Terms including, but not limited to, any claim that all or any part of this Agreement to Arbitrate or the Terms is void or voidable.

Finally, § 20 stated that any arbitration would be conducted under the procedures of the American Arbitration Association and would be held in St. Louis, Missouri, "or at

---

[2] "Services" was defined as "APPLICATIONS, TOOLS, AND SERVICES THAT WE MAY PROVIDE FROM TIME TO TIME."

another mutually agreed location."  It then stated that the
arbitration could be conducted by telephone or in writing if the
relief sought were $10,000 or less, and it set a one-year
deadline to bring claims against Papaya.  A separate section
provided that "THIS TERMS SHALL BE GOVERNED BY AND CONSTRUED IN
ACCORDANCE WITH THE LAWS OF THE STATE OF MISSOURI."

2.    The 2022 Terms

The 2022 Terms took effect on April 28, 2022.  Their
language regarding arbitration was substantively similar to that
in the 2020 Terms.  The introduction included the paragraph:

> By registering an account or otherwise accessing the
> Services, to the maximum extent permitted under
> applicable law, you agree that any claim, dispute, or
> controversy of whatever nature arising out of or
> relating to these Terms and/or your use of the
> Services shall be resolved by final and binding
> arbitration in accordance with the process described
> in section 16 below.[3]

Section 16 was largely the same as § 20 of the 2020 terms,
although it revised the location of any arbitration to "Tel
Aviv, Israel or at another mutually agreed upon location."[4]

---

[3] In this version, "Services" was defined as "all features,
content, and other services provided by Papaya, including
without limitation our website . . . and gaming applications
. . . ."

[4] This provision maintained the exception for disputes in which
the relief sought was $10,000 or less, in which case either
party could elect to conduct the arbitration telephonically or
in writing.

7

Separately, the "Governing Law" provision, at § 18, stated that, for American users, the 2022 Terms would be "governed by and construed in accordance with the laws of the State of California, U.S." A separate provision explained that Papaya could change the Terms of Use in the future, and that "The most current version of these Terms will govern your use and access of the Services."

> 3. The 2023 Terms

The 2023 Terms, which became effective March 28, 2023, moved the notice of the arbitration to its first paragraph, set in bolded, capital letters. That paragraph read:

> IMPORTANT NOTICE: THESE TERMS ARE SUBJECT TO A BINDING ARBITRATION PROVISION AND WAIVER OF CLASS ACTION RIGHTS, AS DETAILED IN SECTION 17 BELOW. YOU AGREE THAT ANY CLAIM OR DISPUTE AT LAW OR EQUITY THAT HAS ARISEN OR MAY ARISE PURSUANT TO THESE TERMS OR THE USE OF THE SERVICES, AS DEFINED BELOW, WILL BE RESOLVED IN ACCORDANCE WITH SECTION 16 BELOW. PLEASE READ THAT SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS AND OBLIGATIONS.

Section 17 included largely the same content as the previous version's arbitration sections did.[5] Like the 2020 and 2022 version, the 2023 Terms included the delegation to an arbitrator of "exclusive authority" to resolve disputes regarding the enforceability of the terms. And they again included the

---

[5] The 2023 Terms' first paragraph refers to both § 17 and § 16. The reference to § 16 appears to be an error.

statement that "The most current version of these Terms will govern your use and access of the Services."

In contrast to the earlier iterations, this version changed the location of an arbitration, for U.S. residents, to New York City "or another mutually agreed upon location."  It again said that, if the relief sought in a users' dispute were less than $10,000, either party could elect to have the arbitration proceeding held over the telephone or based on written submissions.

The 2023 Terms also included a right to opt out of the arbitration and class action waiver provisions for users who sent an emailed notice of their decision to opt out within 30 days of the later of the 2023 Terms' effective date or the user's first use of Papaya's services.  The plaintiff did not send such a notice.

C.    The March 2023 Email Notice

Papaya attests that on March 28, 2023 -- the day that the 2023 Terms took effect -- it sent an annual email notice to every Papaya user.  The email informed its recipients that Papaya had updated its terms of use, effective that day, "to reflect the development in our services and update the dispute resolution provisions."  The email included a link to the webpage with the 2023 Terms.

9

The plaintiff submits that she never received this email. Although she has other promotional emails from Papaya, she says she did not find it in her account when she later searched for it.

D.   Procedural History

The plaintiff filed the complaint in this action in the Southern District of New York on March 27, 2024.[6]  The case was referred to this Court as related to an action brought against Papaya by one of its competitors, Skillz Platform Inc.  Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24cv1646.  Papaya filed its motion to compel arbitration on August 23.  The motion was fully briefed on November 5.

## Discussion

When deciding motions to compel arbitration, courts may apply a standard "similar to that applicable for a motion for summary judgment."  Barrows v. Brinker Rest. Corp., 36 F.4th 45, 49 (2d Cir. 2022) (citation omitted).  On a motion to compel arbitration, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings,"

---

[6] Subject matter jurisdiction is premised on the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The plaintiff alleges that at least one member of the putative class is a citizen of a state different from the defendants' state of citizenship, and that the amount in controversy is greater than $5,000,000, exclusive of interest and costs.

including affidavits, and "draws all reasonable inferences in favor of the non-moving party." Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (citation omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." Id. (citation omitted).

The Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA establishes a "liberal federal policy favoring arbitration agreements," requiring courts "rigorously to enforce arbitration agreements according to their terms." Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018) (citation omitted). And "a court must hold a party to its arbitration contract just as the court would to any other kind." Morgan v. Sundance, Inc., 596 U.S. 411, 412 (2022).

Even so, courts "will not enforce arbitration unless and until it is determined that an agreement [to arbitrate] exists." Soliman v. Subway Franchisee Advert. Fund Trust, Ltd., 999 F.3d

828, 834 (2d Cir. 2021).  "An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all.  And if it is not a contract, it cannot serve as the basis for compelling arbitration."  Dr.'s Assocs., Inc. v. Alemayehu, 934 F.3d 245, 251 (2d Cir. 2019).  If an agreement to arbitrate does exist, the court must then consider whether it applied to the plaintiff's claims.  Meyer, 868 F.3d at 74.

There is no dispute that Papaya's Terms of Use included a mandatory arbitration provision and that, if the plaintiff agreed to it and it were enforceable, it would cover her claims. The plaintiff first argues that she did not agree to the arbitration provision.  Second, the plaintiff argues that, even if there was an agreement to arbitrate, it is unenforceable because it is unconscionable and illusory, and the provision delegating determinations of enforceability to the arbitrator is itself unconscionable.

The plaintiff's arguments fail.  A valid arbitration agreement was formed, and its clause delegating to the arbitrator questions of enforceability is itself enforceable. Accordingly, Papaya's motion is granted.

I.    Agreement to Papaya's Terms of Use

The threshold question whether the parties agreed to arbitrate "is governed by state contract law." Soliman, 999 F.3d at 834.  The Second Circuit recently explained in the context of motions to compel arbitration that "traditional contract formation law does not vary meaningfully from state to state." Edmundson v. Klarna, Inc., 85 F.4th 695, 702-03 (2d Cir. 2023).  The parties cite the same body of Second Circuit caselaw, so that body of Second Circuit caselaw is what the following analysis relies on as well.

"To form a contract, there must be a manifestation of mutual assent to the exchange between two or more parties made by written or spoken word, or by conduct." Id. at 703 (citation omitted).  With respect to online consumer contracts, even when a consumer had no actual notice of the contract's terms, a contract is formed when (a) "a reasonably prudent person would be on inquiry notice of the terms," and (b) "the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." Id. (emphasis omitted) (citation omitted).  This inquiry uses "an objective standard" and is "fact-intensive." Id. (citation omitted).

Because the plaintiff agreed to Papaya's Terms of Use when she selected a payment type on the deposit screen, she agreed to

the arbitration clause it contained.[7]  The plaintiff's arguments
to the contrary, including that the Terms of Use required some
future conduct for the arbitration agreement to take effect, are
unavailing.

A.    The Deposit Screen

The parties' dispute over the arbitration agreement's
execution centers primarily on whether the plaintiff's
encounters with the deposit screen constituted sufficient notice
of and assent to Papaya's Terms of Use.  Papaya is correct that
they did.

1.    Notice of the Terms

"A reasonably prudent internet or smartphone user is on
inquiry notice of contractual terms where the terms are
presented in a clear and conspicuous way."  Id. at 704.  Courts
look to the "design and content of the relevant interface" to
decide whether it would have put the user on inquiry notice.
Id.  Inquiry notice exists where the "terms are linked on an
uncluttered interface and temporally and spatially coupled with
the mechanism for manifesting assent."  Id. (citation omitted).

---

[7] Papaya argues that the plaintiff was also notified of the
arbitration agreement via a March 28, 2023 email in which Papaya
informed its users of the "dispute resolution provisions" in the
2023 Terms.  Because the plaintiff was notified of and assented
to the 2023 Terms (and its predecessors) through the deposit
screen, it is unnecessary to resolve the parties' dispute over
whether the plaintiff received the email.

Inquiry notice may exist even where the terms are only available by hyperlink, see Meyer, 868 F.3d at 78, and where the notice and link to the terms are in smaller font than other text in the interface.  See Edmundson, 85 F.4th at 706.  Terms are temporally coupled to the manifestation of assent at "purchase or enrollment," including when a consumer is "about to receive a benefit."  Id.

Papaya's deposit screen meets the criteria for inquiry notice.  Indeed, it strongly resembles mobile-based interfaces that the Second Circuit has held provide inquiry notice in recent decisions.  As in both Edmundson and Meyer, the terms are hyperlinked within a sentence, written in small text positioned near payment buttons, alerting the user that they are agreeing to the terms by proceeding with their interactions with the applications.  Meyer, 868 F.3d at 82; Edmundson, 85 F.4th at 711.  As in those cases, the "content is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice" of the terms.  Edmundson, 85 F.4th at 705 (citation omitted).  The notice of and hyperlink to the terms appear "directly adjacent to the button intended to manifest assent to the terms."  Id. at 706 (citation omitted).

Papaya's placement of the notice on a screen where the user is depositing money for use in future games means that "a

reasonably prudent user would understand that the terms
presented on the interface govern the user's future
relationship" with Papaya.  Id. at 706-707.  And the language of
the notice, starting with "By continuing", follows Edmundson and
Meyer in "signaling to users that they will be agreeing to
[Papaya's] terms through their conduct," as opposed to merely
providing a link to them.  Id. at 707.

While the plaintiff repeatedly refers to the Court of
Appeals decision in Nicosia v. Amazon.com., Inc., 834 F.3d 220
(2d Cir. 2016), the webpage at issue there is distinguishable.
It was more complicated and cluttered.  Id. at 237, 241.  The
interface in that case involved "between fifteen and twenty-five
links . . . alongside multiple buttons and promotional
advertisements" and other distracting information, including the
customer's personal address, credit card information, shipping
options, and purchase summary.  Id. at 237.

The plaintiff argues that the sentence notifying users of
the terms was in small, hard-to-read font and was overshadowed
by other content on the screen.  The sentence was neither hard
to read nor overshowed by other content.  While the deposit
screen included other information related to the user's deposit
and buttons of various colors, it had virtually all of the
"indicia of clarity that satisfied the reasonable

16

conspicuousness standard in Meyer" and Edmundson.[8]  Soliman, 999
F.3d at 841.

      2.   Manifestation of Assent

Although it need not be express, a consumer's agreeing to
an online contract must "unambiguously manifest[] assent."
Edmundson, 85 F.4th at 703 (citation omitted).  "[T]here must be
evidence that the offeree knew or should have known of the terms
and understood that acceptance of the benefit would be construed
by the offeror as an agreement to be bound."  Id. at 704
(citation omitted).  In conducting this inquiry, the Second
Circuit has considered (a) "whether the interface clearly warned
the user that taking a specific action would constitute assent
to certain terms," (b) "whether notice of the contractual terms
was presented to the consumer in a location on the interface and
at time when the consumer would expect to receive those terms,"
and (c) the "course of dealing between the parties, including
whether the contract terms were conspicuously presented to the
consumer at each use of the offeror's service and the consumer's

---

[8] The plaintiff points out that the notice text on the deposit
screen was in dark brown against a tan, or light brown,
background.  But there is no doubt that the text is legible,
and, as in Edmundson and Meyer, it appears in the same color,
against the same color background, as much of the other text on
the screen.

conduct in response to the repeated presentation of conspicuous terms." Id. at 704-05 (citation omitted).

For much the same reasons that a reasonably prudent user was on notice of Papaya's terms of use, the record reflects that the plaintiff unambiguously assented to them. There is no dispute that the plaintiff proceeded through the deposit screen numerous times over the two years that she used Papaya's applications. As discussed above, the interface "clearly warned" users, id. at 704, that "By continuing", they would be agreeing to Papaya's terms. The buttons corresponding to payment methods represented the only choice for the consumer to make on the deposit screen, and thus could not be confused by a reasonable consumer with a different way of "continuing."[9] See id. at 708 ("[W]e have only required that the interface make clear to the reasonable internet user that a specific click signifies assent." (citation omitted)). The notice was presented in a time and place that a reasonable consumer would expect to agree to such terms -- just as the plaintiff was depositing money into her account for use in future games on the platform.

---

[9] A video supplied by the plaintiff's counsel in support of her opposition to the present motion shows that the user chooses the "Deposit Amount" on a different, prior screen. The other fields on the deposit screen (such as "New Balance") are then filled automatically based on that choice.

The "course of dealing between the parties" supports the same conclusion.  The plaintiff was presented with the notice more than a hundred times.  Each of those times, she had reached the deposit screen by selecting an option on a previous screen that would allow her to deposit money in her account.  And each time, she clicked a button on the deposit screen, just above the notice, to deposit money for use in future games.  A reasonable user clicking the button would recognize that they were "entering into a forward-looking relationship" with Papaya.  Id. at 708.

The plaintiff's arguments are largely framed as bearing on the question of notice addressed above, and her distinct arguments regarding assent do not compel a different result. First, the fact that a Papaya user does not receive notice of the terms if the user first uses the free applications does not preclude assent.  The Second Circuit has held that notice and assent exist where they took place at "purchase or enrollment," including the "instance of purchase -- when the user is about to receive a benefit."  Id. at 706.  Here, the notice and assent took place where the user deposited money to a Papaya account that they could then use in games.  The plaintiff provides no reason to think that this transaction is not analogous to, if

19

not actually, the "instance of purchase" where the benefit of
the ability to compete for monetary prizes is conferred.

Second, the plaintiff points out that the notice of the
terms was obscured by other screens once a user clicks on the
Apple Pay button or on the "Credit Card" button.  But this fact
is irrelevant when, as discussed above, the deposit screen put
the user on sufficient notice, and the clicking of one of the
payment buttons qualified as assent.  What happens after the
button was clicked does not alter that conclusion.  Papaya is
not required to give notice on every screen that a user sees.

B.   The Necessity of Future Conduct

The plaintiff separately argues that, even if she agreed to
Papaya's Terms of Use, she never assented to the arbitration
agreement because the 2020 Terms' arbitration agreement required
some future conduct to take effect.  The plaintiff quotes
language stating that the user agreed to arbitrate any relevant
disputes "[B]Y REGISTERING AN ACCOUNT AND/OR OTHERWISE ACCESSING
THE WEBSITE."

This argument fails for a couple of reasons.  First, the
plaintiff did register an account, and she does not explain why
subsequently agreeing to the 2020 Terms would not validly
execute them.  Second, even if the 2020 Terms required some
future conduct that never took place, the plaintiff agreed to

20

the 2022 and 2023 Terms, which also contained arbitration agreements and did not contain the same language that the plaintiff argues limited the applicability of the 2020 Terms.

II. Enforceability of the Delegation Clause

"Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show[] the agreement to be inapplicable or invalid." Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 102 (2d Cir. 2022) (citation omitted). Under the FAA, an arbitration agreement may be unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The plaintiff does not dispute that her claims fall within the arbitration agreement, but she argues that the agreement was unconscionable and thus unenforceable. And while she acknowledges that the terms of the agreement delegate the question of enforceability to an arbitrator, the plaintiff further argues that the delegation clause itself is unconscionable. The plaintiff fails to meet her burden. Under the applicable law, the delegation clause is enforceable. Accordingly, the enforceability of the arbitration agreement itself must be resolved in arbitration.

A.    Governing Law

The parties disagree about which state law governs the delegation clause of the Terms of Use.  The plaintiff appeals to both Missouri law, which governed the 2020 Terms, and to California law, which governed the 2022 and 2023 Terms.  Papaya argues that only California law is relevant, pursuant to the 2023 Terms.  Papaya is correct.  The 2023 Terms, much like the two versions before them, stated that "[t]he most current version of these Terms will govern your use and access of the Services."  Because the 2023 Terms were the last version to which the plaintiff assented, that agreement governs, and its choice of California law controls the following analysis.[10]

B.    Unconscionability

"Under California law, a contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party."  Ronderos v. USF Reddaway, Inc., 114 F.4th 1080, 1089 (9th Cir. 2024) (citation omitted).  "Both procedural and substantive unconscionability must be shown for the defense to be established, but they need not be present in the same degree."  Id. (citation omitted).  To challenge a

_____

[10] The plaintiff acknowledges that the same legal framework applies under both states' contract law.

22

delegation clause within an arbitration agreement -- that is, the arbitrability of arbitration itself -- the party must make arguments specifically about that provision, but it can do so on the same bases from which it challenges other aspects of the arbitration agreement.  Bielski v. Coinbase, Inc., 87 F.4th 1003, 1009-10 (9th Cir. 2023) (citing Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 74 (2010)).  If the delegation clause is enforceable, the question of the agreement's enforceability otherwise must be left to the arbitrator.  See Rent-A-Center, 561 U.S. at 68-69.

Applying California law's "sliding scale approach" to unconscionability, Ronderos, 114 F.4th at 1099, the 2023 Terms' delegation clause exhibits, at most, minimal procedural unconscionability and no substantive unconscionability. Accordingly, the clause is enforceable.

　　　　1.　 Procedural Unconscionability

"Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion." Heckman v. Live Nation Ent., Inc., 120 F.4th 670, 681 (9th Cir. 2024) (citation omitted).  California courts then "focus on the factors of oppression and surprise." Id. (citation omitted).  The former "arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." Id.

at 682 (citation omitted).  Surprise is a "function of the
disappointed reasonable expectations of the weaker party, and
can arise when the supposedly agreed-upon terms of the bargain
are hidden in a prolix printed form drafted by the party seeking
to enforce the disputed terms." Id. (citation omitted).

The delegation clause involves at most a small amount of
procedural unconscionability.  The plaintiff is incorrect that
the 2023 Terms were an adhesion contract, because they allowed
her to opt out of the arbitration agreement (including the
delegation clause) by sending an email to an address included in
the agreement.[11]  See Kilgore v. KeyBank, 718 F.3d 1052, 1059
(9th Cir. 2013) (finding no procedural unconscionability based
on a similar provision).  This fact weighs against a finding
that the plaintiff was faced with an "absence of meaningful
choice." Heckman, 120 F.4th at 682 (citation omitted).  And
there is no allegation that Papaya dominates its market such
that the plaintiff could not access similar services elsewhere.
See id.  The plaintiff has a stronger argument with respect to

---

[11] Even if the 2023 Terms had been an adhesion contract, the
California Supreme Court has recently explained that such
agreements "are indispensable facts of modern life that are
generally enforced" and "adhesion alone generally indicates only
a low degree of procedural unconscionability." Ramirez v.
Charter Commc'ns, Inc., 16 Cal. 5th 478, 494 (2024) (citation
omitted).

surprise, as the delegation clause appears after 17 pages of dense text in the 2023 Terms.  But the document also includes as its very first paragraph a relatively short, bolded notification of the arbitration agreement and directions as to where the complete provision appears below.

The plaintiff also notes that Papaya did not ask users to sign or acknowledge the delegation clause specifically.  She cites a decision finding "some degree of procedural unconscionability" where the plaintiff was not required to do so, where he was required to agree or else sever his relationship with his counterparty, and where the agreement failed to call his attention to the challenged agreement.  Lim v. TForce Logistics, LLC, 8 F.4th 992, 1001 (9th Cir. 2021). But the latter two elements are not present here, so, "[v]iewing the evidence as a whole," id., the same conclusion does not follow in these circumstances.  See also id. ("The party who drafts an agreement is under no obligation to highlight the arbitration clause of its contract, nor [i]s it required to specifically call that clause to [a counter-party]'s attention." (citation omitted)).

2.    Substantive Unconscionability

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they

are overly harsh or one-sided." Heckman, 120 F.4th at 683
(citation omitted).  California courts in this context consider
"mutuality and whether procedures make the odds far more likely
for one side."  Id. at 686 (citation omitted).

Even if the delegation clause exhibited some procedural
unconscionability, the plaintiff fails to show that it was
substantively unconscionable.  Two of her arguments -- one
regarding the arbitrator's ability to consolidate claims, and
one about the limitation of Papaya's liability -- involve other
parts of the arbitration agreement but do not explain why the
delegation clause itself is unconscionable.  See Bielski, 87
F.4th at 1009-10.

The plaintiff's one argument that bears on the delegation
of the arbitrability determination refers to the 2023 Terms'
provision that arbitration will be held in New York, New York,
"or at another mutually agreed upon location," which the
plaintiff argues is more convenient to Papaya than to her.  This
provision does not establish substantive unconscionability.

First, the 2023 Terms also allow either party to opt for
telephonic or written proceedings if the complainant is seeking
$10,000 or less.  This exception precludes the outcome
California courts have sought to avoid in some of the decisions
that the plaintiff cites -- that the cost of travel to the

26

arbitration would exceed the relief sought.  See Lhotka v. Geographic Expeditions, Inc., 181 Cal. App. 4th 816, 825 (Cal. Ct. App. 2010).  The plaintiff alleges, and Papaya does not dispute, that Papaya's U.S. headquarters is in New York, while the plaintiff lives in Minnesota.  But "inconvenience and expense of a forum alone is not enough to treat forum-selection clauses as unreasonable" under California law, and assessing their enforceability requires "tak[ing] into account the respective circumstances of the parties."  Lim, 8 F.4th at 1002. The plaintiff does not show that, under these circumstances, the selected forum "would be unavailable or unable to accomplish substantial justice," at least with respect to arbitrating arbitrability.  Id.  And the facts that the plaintiff's lawyers are in New York and that she filed this action here further undermine the notion that this provision is substantively unconscionable.

## Conclusion

Papaya's August 23, 2024 motion to compel arbitration is

granted.   This action is stayed pending the outcome of
arbitration proceedings.

Dated:      New York, New York
            December 17, 2024

                                    _____
                                         DENISE COTE
                              United States District Judge